
AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

### DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | AFFIDAVIT |
| GHEEVARGHESE PAPPEN | |
| | CASE NUMBER: |
| | UNDER SEAL |

I, Raymond Boatright, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

    1. Your Complainant, Raymond Boatright, is a Special Agent with the Defense Criminal Investigative Service ("DCIS"). Your Complainant's responsibilities include the investigation of possible criminal violations of Title of 18 of the United States Code.

    2. I have been a Special Agent with DCIS for over 2 years. Prior to that, I was a Special Agent with the United States Customs Service for approximately one year. I have personally conducted or assisted in investigations of alleged criminal violations of U.S. law, including bribery, 18 U.S.C. § 201. I am familiar with the facts and circumstances set forth below based upon conversations with other law enforcement agents, in particular agents of the United States Army Criminal Investigation Division ("CID"). This Complaint is being submitted for the limited purpose of establishing probable cause to believe that Gheevarghese Pappen ("PAPPEN") has knowingly violated the criminal laws of the United States, namely, bribery in violation of 18 U.S.C. § 201. Therefore, I have not included the details of every aspect of this

1

investigation but only those facts to support probable cause.  Where conversations or statements are related herein, they are related in substance and in part only unless otherwise indicated.

     3.  PAPPEN is a United States Army Corps of Engineer ("COE") civilian employee, GS-12, currently detailed to the U.S. Army Area Support Group ("ASG"), Host Nation Office at the United States Army Base, Camp Arifjan, Kuwait, APO AE 09366.

     4.  In his official capacity, PAPPEN's responsibilities include securing housing for United States Army personnel assigned to work at Camp Arifjan by renting apartments for them in and around Kuwait City. This Application for a Criminal Complaint arises from allegations that PAPPEN solicited bribes from a Kuwaiti national, Fahhad Abdullah Matar ("Matar"), a realtor in Kuwait, by requiring Matar to pay PAPPEN bribe payments in exchange for entering into rental contracts with Matar on behalf of the U.S. Government.  Matar is cooperating with CID.  This investigation began when an Army Chief Warrant Officer directed Matar to CID and report PAPPEN's conduct.

     5.  According to Matar, PAPPEN was introduced to Matar in approximately May 2005 through a man named Moustafa, who had previously done business with PAPPEN.  PAPPEN and Matar discussed PAPPEN renting apartments from Matar, and PAPPEN went with Matar to look at apartments in two apartment buildings in Kuwait City.  During this meeting, PAPPEN advised Matar that Matar would have to pay PAPPEN 25 Kuwaiti Dinar (valued at approximately $85) per month for each rental property for the duration of the rental agreement.  According to Matar, PAPPEN told Matar that if agreed to pay PAPPEN, PAPPEN would enter into additional rental agreements with Matar on behalf of the U.S. government .  Matar then agreed to rent to the U.S. Government seven apartments at a rental property known as Union

Center and ten apartments at the property known as Latifa Towers, both in Kuwait City.

6. PAPPEN later called Matar and asked Matar to meet PAPPEN at his suite at the Crown Plaza hotel in Kuwait City. According to Matar, when he arrived at PAPPEN's hotel, PAPPEN made Matar sign the rental contract without allowing Matar to read it. PAPPEN then showed Matar a check for 107,100 Kuwaiti Dinar (approximately $363,800) issued by the U.S. Government for all of the rental properties. PAPPEN told Matar he had to make adjustments to the properties, such as additional cleaning services and/or furniture replacement, and then Matar would be paid. PAPPEN also stated that Matar had to pay PAPPEN 8,500 Kuwaiti Dinar (approximately $28,900) in cash once he received the government check. Matar then made the adjustments. On or about June 29, 2005, another ASG employee verified that the adjustments had been made and gave Matar the check for 107,100 Kuwaiti Dinar. PAPPEN then called Matar and told Matar to meet him at a local Indian restaurant the next day with 8,500 Kuwaiti Dinar in cash in an envelope. The following day, Matar met PAPPEN and the restaurant and paid the bribe payment to PAPPEN.

7. CID agents working in Kuwait have personally reviewed the rental agreement and have personally interviewed U.S. government employees who have confirmed that the rental agreement was in fact entered into between Matar and the ASG. According to Matar, in approximately July 2005, PAPPEN called Matar on the telephone and told Matar that he had to keep this transaction a secret in order to continue to win contracts with the United States Government. PAPPEN also told Matar that some of the money was going to important people in PAPPEN's office in Savannah, Georgia.

8. In approximately November 2005, Matar and PAPPEN resumed discussions about rental properties. Matar told PAPPEN about three properties in Kuwait City, Kuwait where

3

apartments were available, at Union Center, Latifah Towers and Shaheen Towers. PAPPEN again solicited bribes from Matar, telling Matar that he would have to pay PAPPEN 75 Kuwaiti Dinar per month for the properties at Union Center and Latifah Towers, but that PAPPEN would cut Matar a deal and only require 25 Kuwaiti Dinar per month for the apartments at Shaheen Towers. Matar was unable to secure the properties at Union Center and Latifah Towers, but he entered into rental agreements with ASG on the apartments at Shaheen Towers, and agreed to pay PAPPEN the bribe.

    9. The bribe scheme was discovered when, on or about February 27, 2006, PAPPEN and his supervisor, a U.S. Army Chief Warrant Officer, inspected apartments in Shaheen Towers. While inspecting the apartments in anticipation of paying Matar, the Chief Warrant Officer, asked Matar how much Matar was charging per apartment, and Matar said that the U.S. government was being charged 600 Kuwaiti Dinar per month. According to Matar, the Chief Warrant Officer then stormed out of the apartment. Matar later learned from the Chief Warrant Officer that PAPPEN claimed that the U.S. government was going to be charged 650 Kuwaiti Dinar per apartment. Matar then admitted to the Chief Warrant Officer that Matar had paid a bribe payment to PAPPEN in return for obtaining the May 2005 rental contracts and was attempting to do the same in order to secure the rental agreements on the Shaheen Tower apartments. The Chief Warrant Officer then advised Matar to contact CID and advise them of PAPPEN's conduct, which he did.

    10. During the week of March 13, 2006, Matar contacted CID agents and advised that PAPPEN gave Matar the government-issued check for the May 2005 rental agreements. Over the course of several days, PAPPEN and Matar had several telephonic conversations in Kuwait and made arrangements to meet so that Matar could give PAPPEN a bribe payment of

6,600 Kuwaiti Dinar (approximately $19,000).

11. On or about March 15, 2006, Matar met with CID agents at an off-base location where Matar provided the agents with the 6,600 Kuwaiti Dinar that he was going to use to bribe PAPPEN. The agents then took custody of the money, counted it and photocopied it.

12. On or about March 16, 2006, PAPPEN met with Matar outside of Loalowe Towers in Kuwait City, Kuwait. Just prior to the meeting with PAPPEN, agents returned the 6,550 Kuwaiti Dinar to Matar. Agents also provided Matar with a recording device. Matar then recorded his conversation with PAPPEN at the CID agents' direction. During this meeting, Matar provided PAPPEN with the 6,550 Kuwaiti Dinar bribe payment and PAPPEN accepted it. CID agents have listened to the recorded conversation between Matar and PAPPEN and learned that Matar and PAPPEN discussed a future contract for a rental property within Loalowe Towers. Matar and PAPPEN discussed the amount of the bribe payment PAPPEN expected to be paid and, PAPPEN stated, "why don't we do 50/50" and also stated, "switch it around . . . you take 40, I take 30, does that make you happy?"

13. Based upon your Complainant's experience, I believe that conduct described above constitutes bribery, a violation of 18 U.S.C. § 201.

Signature of Complainant: _____

**Raymond Boatright**
**Special Agent**
**Defense Criminal Investigative Division**

Approved:   Andrew Lourie, Acting Chief
Brenda K. Morris, Deputy Chief for Litigation
James A. Crowell IV, Trial Attorney
Ann C. Brickley, Trial Attorney
Public Integrity Section, Criminal Division, U.S. Department of Justice

**Sworn to before me and subscribed in my presence on March \_\_\_, 2006, at Washington, D.C.**

Signature: _____     _____, Magistrate Judge